UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Heidi I., | Case No. 22-cv-1970 (JWB/DTS) |
| Claimant, | |
| v. | **REPORT AND RECOMMENDATION** |
| Kilolo Kijakazi,<br>*Acting Commissioner of Social Security,* | |
| Defendant. | |

## INTRODUCTION

Claimant Heidi I. appeals the denial of her application for benefits under Title II of the Social Security Act. Cl.'s Mem. of Law in Support of Mot. for Summary Judgment (Cl. Mem.) at 3; Dkt. No. 17. Her claim was denied initially and on reconsideration. She requested and received review by an Administrative Law Judge (ALJ), who determined Claimant was not eligible for benefits. Administrative Record (Admin. Rec.) at 23-42; Dkt. No. 12; The Social Security Appeals Council denied Claimant's request for review. *Id.* at 9. This appeal to district court followed.

Claimant makes two primary arguments. First, she contends the Residual Functional Capacity (RFC) determination was flawed because it failed to account for her limitations in adapting and managing herself. Second, Claimant contends the ALJ erred as a matter of law in failing to account for the effect of the episodic nature of mental impairments on her ability to sustain work on a continuous basis. As part of that overall argument, Claimant also argues the ALJ's assessment of her psychiatrist's opinion was flawed.

For the reasons explained below, the Court recommends that the Commissioner's decision be affirmed, her Motion for Summary Judgment [Dkt. No. 21] be granted, and the Claimant's Motion for Summary Judgment [Dkt. No. 16] be denied.

## BACKGROUND

### I. Procedural History

Claimant filed her application for disability insurance benefits on April 28, 2021, alleging disability beginning March 1, 2021 based on depression, anxiety, and hemiplegic migraines. Admin. Rec. at 211; Dkt. No. 12. In late March, she visited the emergency room, complaining of headache, bilateral arm numbness and excess sleeping. Her husband described her as being in a "zombie state." She had a normal neurologic exam and was discharged to her home. *Id.* at 387. The next day, she returned to the ER, reporting confusion, amnesia, and left-sided weakness. *Id.* at 400. She reported similar instances in the past, but that they had been worsening over the previous months. *Id.* She reported high stress levels, with four children at home and longstanding struggles with sleep. Moreover, her infant nephew had unexpectedly died just the day before. *Id.* at 401. She and her family were also living in her in-laws' basement pending the completion of a remodel on their home. *Id.* at 164, Dkt. No. 12-4. She underwent neurological testing and imaging to rule out stroke and cerebral ischemia. *Id.* Treatment notes also indicate suspected possible migraine or seizures based on her symptoms. Doctors noted that the "significant amount of stress caring for her family recently and [] recent bereavement from the death of her infant nephew [] could be provoking migraines, lower seizure threshold, or contributing to conversion disorder." *Id.* at 402. Neurology suggested possible confusional migraines. *Id.* at 409.

Neurologist Jacob Hvidston opined Claimant's neurological symptoms were caused by underlying migraine headache. While neurological symptoms had not accompanied earlier migraines, at this time "[g]iven her multiple stressors I do also suspect there is underlying psychosocial overlay to her transient neurologic symptoms."[1] *Id.* at 421. He prescribed her a graduated prescription of Topamax, an anticonvulsant often used to prevent migraines. *Id.*

Claimant again visited the emergency department at the end of April 2021, complaining of left-sided headache and confusion. *Id.* at 442-43. She returned to the hospital the next day, after experiencing involuntary movements, including clenching fists. *Id.* at 462. Exam findings were largely normal, including normal mood and non-delusional thought content. *Id.* at 468. Doctor Cara Moen noted "significant psychiatric stressors at play" and to "strongly consider psychiatry involvement." *Id.* at 472. Claimant self-reported that the spells of neurological symptoms—amnesia, decompensation and derealization—almost all occur "shortly after a significant stressor in her life" and cited her nephew's death as one example. *Id.* She also explained her son was undergoing a high intensity program for children with Autism Spectrum Disorder, which was stressful. *Id.* at 473. Upon exam, Claimant explained that her husband's ex-wife was tormenting

---

[1] Claimant seems to contend this means the headaches with neurological symptoms were the result of her mental health impairments, but that is not clear from the record. Cl. Mem. at 25; Dkt. No. 17 ("The Plaintiff's own neurologist, Jacob A. Hvidston, M.D., found that there was a substantial psychosocial component to Plaintiff's physical symptoms resulting in the severe headache spells."). But more fundamentally, whether the origin of Claimant's impairments are first psychological or first neurological—that is, whether the migraines are causing increased mental impairment or whether the presence of mental impairment is exacerbating the migraines—is largely irrelevant, because the ALJ must examine the entirety of the record and the totality of the Claimant's condition in assessing disability. *Strongson v. Barnhart*, 361 F.3d 1066, 1069-70 (8th Cir. 2004).

3

her. The provider noted that those reports could be perceived as paranoid in nature, but this concern was never repeated and the record appears to support the reality of the ex-wife's mistreatment of Claimant. *Id.* at 481. By the end of April, doctors seemed in agreement that Claimant was suffering from hemiplegic migraine.[2] She had some trouble finding words during this visit but that difficulty resolved before discharge. Claimant self-described her depression as "adequately treated." *Id.* at 500.

By mid-May Claimant was described as "back at baseline" and no longer having difficulty finding words or stuttering. Admin. Rec. Part 1 and 56; Dkt. No. 12-1. In June her Generalized Anxiety was described as "stable." Her anxiety and depression appeared to fluctuate, based on weekly session notes from her psychologist Matthew Webb. Dkt. No. 12-3 at 49-95. In August 2021, Dr. Webb suggested her psycho/physiological symptoms were all attributable to heightened stress. *Id.* at 55. Throughout this time, she continued caring for her children and maintaining the home. *Id.* While she occasionally reported heightened levels of anxiety, she also reported reduced stress. *Id.* at 79-95. In September, Claimant's mental status was normal, with normal mood and affect, no signs of psychosis or hallucinations. However, she had experienced one brief episode of derealization for which she did not seek medical attention. *Id.* at 95.

That fall, Claimant complained of daily headache with some blurry vision and pain in her eyes. She reported severe anxiety and continued agitation about her

---

[2] Hemiplegic migraine is a rare form of migraine marked by one-sided body weakness with headache and aura. It may also include fever, changes in consciousness including confusion and coma, coordination problems, nausea, vomiting, and increased phono- and photosensitivity. *Hemiplegic Migraine: Symptoms and Treatment*, AM. MIGRAINE FOUND., https://americanmigrainefoundation.org/resource-library/hemiplegic-migraine/ (last visited May 25, 2023).

husband's ex-wife's conduct. Dkt. No. 12-5 at 79-97. She also reported "doing alright" and "feeling well." *Id.* at 79, 48. She was in a minor car accident in December and reported anxiety around driving after that but did resume driving shortly after. *Id.* at 17.

The Commissioner uses a five-step sequential evaluation process to determine whether a claimant is entitled to disability benefits. 20 C.F.R. § 404.1520(a). The Commissioner evaluates "(1) whether the claimant is currently employed; (2) whether the claimant is severely impaired; (3) whether the impairment is, or approximates, a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant can perform any other kind of work." *Brock v. Astrue*, 674 F.3d 1062, 1064 n.1 (8th Cir. 2012); *see also* 20 C.F.R. § 404.1520(a)(4).

At Step 1, ALJ Micah Pharris determined Claimant had not engaged in substantial gainful employment since the date of her alleged disability onset. Admin. Rec. Part 1 at 21; Dkt. No. 12. At Step 2, the ALJ determined Claimant has several severe impairments, including obesity, asthma, chronic daily headache and hemiplegic migraine, left frontal cerebral anteriovenous malformation, major depressive disorder, generalized anxiety disorder, and post-traumatic stress disorder. *Id.* at 22. Even so, the ALJ found at Step 3 that those impairments, considered individually or taken together, did not meet the severity of any impairment listed in 20 C.F.R. § 404. *Id.* at 22-28. Claimant does not challenge these findings.

At Step 4, the ALJ determined Claimant has the following residual functional capacity (RFC):

> Perform work at all exertional levels with the following limitations: the individual may never climb ropes, ladders, or scaffolds. The individual may not work in an environment where the noise level is greater than 'moderate' as that term is defined in the DOT and the SCO. The individual

5

> may have only occasional exposure to airway irritants and no exposure to unprotected heights or hazards, as the term hazards is defined in the DOT and the SCO. Finally, this individual would be limited to simple routine repetitive tasks.

Admin. Rec. Part 1 at 28-36; Dkt. No. 12. Based on the Claimant's RFC the ALJ determined Claimant can perform her past relevant work as a cashier and other jobs existing in the significant numbers in the national economy, precluding a finding of disability at Step 5. Claimant appeals that denial under sentence four of 42 U.S.C. § 405(g). Pl. Mem.; Dkt. No. 16.

## II.     Standard of Review

Disability under the Social Security Act means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under Social Security regulations, disability means that the impairment(s) is/are so severe that the claimant is not only unable to engage in previous work but cannot engage in any other kind of substantial gainful employment that exists in the national economy. *Id.* § 423(d)(2)(A). The claimant bears the burden of proving entitlement to disability benefits. *See* 20 C.F.R. § 404.1512(a)(1); *Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013).

This Court has authority to "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying or reversing a decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g) (sentence four). The Court must uphold the Commissioner's decision if it is supported by substantial evidence in the record as a whole and is not

6

based on legal error. *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018). Substantial evidence is "less than a preponderance but enough that a reasonable mind would find it adequate to support the conclusion." *Id.* (quotation and alteration omitted). The Court "must consider evidence that supports and detracts from the ALJ's decision." *Cuthrell v. Astrue*, 702 F.3d 1114, 1116 (8th Cir. 2013). "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Id.* (quotation omitted).

## ANALYSIS

### I. Adapting and Managing Oneself

Claimant argues the RFC is not supported by substantial evidence in the record because it fails to account for her moderate functional limitation in adapting or managing herself. Cl. Mem. at 11; Dkt. No. 17. In assessing mental impairments, ALJs address four categories of functioning, known as the "paragraph B criteria." Those categories are the ability to (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. 20 C.F.R. § 404.1520a(c)(3). The ALJ must rate a claimant's limitation in each area as none, mild, moderate, marked, or extreme. Any finding over mild, *i.e.* any limitation of moderate, marked, or extreme, is considered severe. Where, as here, the severe impairments neither meet nor exceed the severity of any listed mental disorder, the ALJ assesses the Claimant's RFC. *Id.* at 404.1520a(d)(2), (3). In this case, the ALJ determined that Claimant had only mild limitation in the first and second categories, but moderate limitation in the third and fourth categories.

7

Claimant contends that the ALJ did not properly account for the moderate limitation in the fourth category—ability to adapt and manage oneself. She claims that there is only one enumerated mental limitation in the RFC, which limits Claimant to "simple routine repetitive tasks." Claimant avers this only addresses her moderate limitation in category three (ability to concentrate, persist, or maintain pace), but not category four. Cl. Mem. at 13-14; Dkt. No. 17.  She argues that while the RFC addresses the issue of concentration, persistence, and pace, "it does not meaningfully account for any limitations in adapting or managing herself due to a limited capacity to adapt to work stress." *Id.* at 14.

However, the ALJ's highly detailed opinion explained the functioning categories that each limitation in the RFC was intended to address. In explaining the reason for "simple routine repetitive tasks", the ALJ addressed both categories three *and* four. As to category four, the ALJ explained "The limits to simple and routine tasks are supported in relation to the longstanding mental impairments with some *difficulty tolerating increased stress.*" Admin. Rec. Part 1 at 38; Dkt. No. 12 (emphasis added). He went on to explain that "the limited course of treatment and findings and the claimant's relatively high activities of daily living all do not support greater limits, including the allegations of *being off task* a significant portion of workday, needing unscheduled *additional work breaks*, and being *absent regularly*, within in the above [RFC]." *Id.* (emphasis added). The ALJ's continued explanation therefore also addressed the third category, as being on task, taking breaks, and absences all relate to Claimant's ability to concentrate, persist, and maintain pace and could also be affected by Claimant's stress tolerance. While Claimant may argue the RFC's limit to "simple routine repetitive tasks" is

8

insufficient to address her limitations in dealing with stress, her allegation that it does not address that limitation at all is unavailing.

Claimant's argument therefore can be read to allege the limitation to "simple routine repetitive tasks" is not supported by substantial evidence in the record. In reaching his finding that the Claimant was moderately limited in adapting or managing herself, the ALJ noted Claimant's "limited and conservative outpatient mental health treatment" and her longstanding impairments which are largely managed through medication. Admin. Rec. Part 1 at 30; Dkt. No. 12. He also explained that much of her psychological treatment has been in service of treating her hemiplegic migraines and that stress was a trigger for those episodes. Her last hospitalization for mental health was in 2007 and recent mental status exams were unremarkable. *Id.* at 31. While Claimant occasionally experienced heightened levels of depression and anxiety, she denied suicidal ideation and "has had limited outpatient treatment." *Id.* During the relevant period, Claimant continued to care for her children, take care of the home, and manage her own medications. *Id.* The ALJ acknowledged that "the claimant has lower stress tolerance and is more likely to have these spells [the hemiplegic migraines] when she is feeling increased situational stress." *Id.* Still, "the limited course of treatment and findings of high activities of daily living all do not support greater limits." *Id.* at 32.

This highly detailed explanation meets the deferential threshold of "substantial evidence" to uphold the ALJ's determination. *Chismarich*, 888 F.3d at 979. Moreover, a review of the record demonstrates the ALJ has based his findings on the entirety of that record. He did not cherry-pick only those details that supported a denial of benefits. In addition to those details cited above, the ALJ explained that Claimant self-reported

9

occasional difficulty with word-finding, headaches several times per week, and a brief episode of neurological symptoms in September, 2021. But the ALJ also noted that the neurological episodes appeared well-controlled after May, 2021, that Claimant had overcome anxiety around driving post-car accident, and that she managed her household, cared for her children, and was working on updated mortgage documentation for her home. While there may be evidence in the record to support alternative conclusions as to Claimant's limitations, there was substantial evidence in the record to support the ALJ's conclusion, and this Court will not disturb his finding. *Cuthrell*, 702 F.3d at 1116.

Claimant also argues the ALJ erred because he did not elicit testimony from a vocational expert about Claimant's limitations in coping with work-related stress. Cl. Mem. at 14; Dkt. No. 17 (citing *Sanders v. Sullivan*, 983 F.3d 822, 823-24 (8th Cir. 1992). Claimant cites *Sanders* in support of her argument, but *Sanders* is distinguishable. There, the ALJ used solely the Medical-Vocational Guidelines to determine the claimant was not disabled; the ALJ did not rely on vocational expert testimony at all. *Sanders*, 983 F.3d at 823. The claimant's limitations, the ALJ opined, would be addressed by virtue of working only an unskilled, entry-level job. *Id.* In finding such a job would address the claimant's limitations, the ALJ had "invaded the province of the vocational expert." *Id.* at 824.

The circumstances of Heidi I.'s case are different. To begin, the ALJ did obtain testimony from a vocational expert, including testimony about Claimant's limitation to simple, routine, repetitive tasks. Admin. Rec. at 64; Dkt. No. 12. The ALJ further inquired about missing work and arriving late, both consequences that may result from

difficulty in managing oneself. *Id.* at 65. Claimant's attorney also questioned the vocational expert about Claimant's ability to handle work-related stress. *Id.* ("[T]ypically if due to symptoms related to a person's depression or anxiety they would have marked limitations in dealing with pressures or changes in routine work setting to the point where they would be off-task 20 percent of the work day, what implications would that have…?"). The ALJ did not determine on his own that Claimant's limitations would be addressed by a certain type of work as was the case in *Sanders*. Instead he relied on the entire record—including vocational expert testimony—in making his determination.

More specifically, the ALJ questioned the VE about the work-related limitations he found credible based on the record, as required under governing law. *Cf. Forte v. Barnhart*, 377 F.3d 892, 897 (8th Cir. 2004) ("The ALJ properly included in the hypothetical question the work-related limitations he found credible."); *Gragg v. Astrue*, 615 F.3d 932, 940 (8th Cir. 2010). As described above, the argument that the ALJ should have asked the VE hypothetical questions about work-related stress is but a challenge to the RFC determination itself. *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011). There is no error where an ALJ's hypothetical includes only those limitations she finds credible and those same limitations are included in the RFC. *Id.; see also Gragg*, 615 F.3d at 941. Admin. Rec. Part 1 at 39-44; Dkt. No. 12. In sum, the RFC was supported by substantial evidence in the record and was not error.

I. **Mental Health Fluctuations**

Claimant contends the ALJ's determination she is not disabled was error because the ALJ failed to "account for the episodic nature" of her mental impairments and the affect that has on her ability to sustain work. Cl. Mem. at 17; Dkt. No. 17.

11

Claimant points out that the Eighth Circuit has repeatedly explained that mental illnesses tend to include "periods of remission" when a claimant may be symptom-free. *Id.* (citing *Andler v. Chater*, 100 F.3d 1389 (8th Cir. 1996)). As a threshold matter, *Andler* and the cases it relied on are somewhat inapposite here because they dealt with claimants experiencing psychosis, delusions, paranoid personality disorders, or schizophrenia. *Andler*, 100 F.3d 1389; *Miller v. Heckler*, 756 F.2d 679 (8th Cir. 1985); *Poulin v. Bowen*, 817 F.2d 865 (D.C. Cir. 1985). While there are suggestions of decompensation and derealization when Claimant experienced her hemiplegic migraine, there were no suggestions she was at risk for ongoing, independent psychosis. In fact, her mental status exams repeatedly showed no signs of psychosis or delusional thoughts. *E.g.* Admin. Rec., Dkt. No. 12-1 at 159, 404; Dkt. No. 12-3 ta 49-51. While she experienced troubling neurological symptoms at times, they were all explained by hemiplegic migraine, not schizophrenia, paranoia, etc. Though Claimant's providers—and the ALJ—all agree that Claimant's migraines and mental health may be linked in some way, Admin. Rec., Dkt. No. 12 at 387, 421, 472, 473, these circumstances are simply distinct from those at issue in *Andler*, *Miller*, and *Poulin*.

Moreover, Claimant's argument is unavailing because there is substantial evidence in the record that her mental impairments were not episodic in the way seen in cases like *Andler*. For example, in *Andler* the claimant experienced "two periods of hospitalization" with a period of higher functioning in between. 100 F.3d at 1393. In *Miller*, claimant undertook "numerous outpatient and emergency visits in 1980, 1981, and 1982". 756 F.2d at 679. In *Poulin*, claimant returned to an outpatient clinic 4 or 5 times in between hospitalizations. 817 F.2d at 871. The record in Heidi I.'s case does

not indicate so many episodes. Instead, there is substantial evidence in the Claimant's record demonstrating only one period or episode of more severe impairment, which the ALJ acknowledged as such. Admin. Rec., Dkt. No. 12 at 33, 34-35. By all accounts the Spring of 2021 was an extremely difficult and disabling period for the Claimant, but one episode of difficulty does not make one's illness "episodic"[3] and the ALJ has pointed to substantial evidence in the record suggesting Claimant's level of functioning increased after that season.

For example, in June 2021 just after Claimant's most difficult period, she was described as anxious, with nervous appearance, shaky voice, and hand-wringing. Admin. Rec. Dkt. No. 12-3 at 10. A couple of weeks later, her anxiety was described as "stable." *Id.* at 16-19. In August she reported making meals for her family and her psychiatrist suggested much of her psycho/physiological problems could be explained by her current circumstances in raising 4 children, getting poor sleep, and living in tight quarters. *Id.* at 55. By late August she reported feeling well in general and her hemiplegic migraines were described as "stable." *Id.* at 72. She described her stress level as "more manageable." *Id.* at 79. In September she reported an isolated incident of derealization and other neurological symptoms for which she did not seek medical attention. *Id.* at 95. In October 2021 Claimant was described as "feeling really good right now!" and her primary care doctor noted her work with behavioral health and her psychiatrist appeared to be "working well overall." Admin. Rec. Part 4 at 286. Thus, while Claimant appeared to have days that were difficult and even experienced a brief incident of neurological symptoms, there is substantial evidence in the record

---

[3] Merriam-Webster Dictionary defines "episodic" as "made up of separate especially loosely connected episodes." Episodic, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/episodic

13

suggesting her experience in March-May 2021 was an *isolated* incident rather than a *repeating* occurrence and that, as the ALJ opined, those symptoms were managed by proper medication. Admin. Rec. Part 1 at 14; Dkt. No. 12 ("Once she was put on proper migraine medications, the claimant did not have an episode of decompensation again.").[4] In sum, the ALJ looked to the entirety of the record, including Claimant's period of acute symptoms in Spring 2021 in making his determination.

Along the same lines, Claimant also argues the ALJ improperly discounted her treating psychiatrist's opinion, asserting he improperly rejected the opinion based on the same failure to consider the fluctuating nature of Claimant's mental impairments. As to Matthew Webb, Psy.D., L.P.'s opinion, ALJ Pharris explained:

> The mental medical source statement from Matthew Webb, Psy.D., L.P., from October 1, 2021, is not persuasive (Ex. 8F). It is not consistent with the evidence after May 2021. Dr. Webb opined moderate difficulties with even short, simple instructions and simple work-related decisions, marked limits with detailed instructions, responding appropriately to work pressures in a usual work setting, and responding appropriately to changes in a routine work setting. He said this high level of limitation was based on his clinical interview and the claimant's report in a subjective symptom inventory, as well as high anxiety and susceptibility to dissociative phenomena over the duration of therapy. However, this high level of limitation is not supported after May 2021 and not over any 12-month period since the alleged date of onset. The mental difficulties are caused by an external factor, and the spells are from a physical condition, not a mental impairment as implied by Dr. Webb's opinion. The medical evidence of record indicates the claimant's PTSD, major depressive disorder, and generalized anxiety disorder symptoms were mild to

---

[4] Claimant contends without citation that the dispositive question is whether she "has experienced sustained improvement such that she will experience no further disabling episodes within the relevant time period. This question is not answered by the ALJ decision." Cl. Mem. at 19-20; Dkt. No. 17. Aside from the fact that the ALJ cannot know the future, the ALJ plainly explained that "the medical evidence of record indicates the claimant was not functioning well at the alleged date of onset and for several months, *but then her functioning improved significantly.* The level of impairment at the alleged date of onset *is not supported for 12 months* from the alleged date of onset or during any 12-month period thereafter.*"* Admin. Rec. at 33; Dkt. No. 12 (emphasis added). The ALJ based this finding on substantial evidence in the record, as described above.

14

> moderate by 12 months from the alleged date of onset and have continued to be mild to moderate through the present, as summarized above.

Admin. Rec. Part 1 at 40; Dkt. No. 12.

Claimant argues the discounting of Webb's opinion was error for two reasons. First, she claims this is yet another example of the ALJ failing to account for the fluctuating nature of mental health impairments. Second, she argues the ALJ "played doctor" by "disregard[ing] the evidence from medical sources in favor of his own hunches" which amounts to legal error. Cl. Mem. at 25; Dkt. No. 17. For the reasons already explained, Claimant's argument that ALJ failed to account for the episodic nature of her mental health fails.

Claimant's argument that the ALJ "played doctor" is also unavailing. In particular, Claimant takes issue with ALJ Pharris's statement that her "mental difficulties are caused by an external factor, and the spells are from a physical condition, not a mental impairment." Cl. Mem. at 25; Dkt. No. 17 (citing Admin. Rec. at 40; Dkt. No. 12). She argues that Dr. Hvidston had opined exactly the opposite—that the spells of neurological symptoms were caused by her mental health. *Id.* Dr. Hvidston's statement is not nearly so cut and dry, however. He merely opined that the "transient neurological symptoms" likely had a "psychosocial overlay." That alone does not indicate which came first, the mental illness or the migraine. It merely tells you the presentation of the migraine may be affected by the mental illness.

But even if the ALJ's statement itself was incorrect, any error is harmless. The ALJ did not "simply draw his own inferences . . . from medical reports." *Strongson*, 361 F.3d at 1070. Instead, he discounted Webb's opinion "based on all the relevant

15

evidence, including the medical records, observations of treating physicians, and others, and an individual's own description of [her] limitations." *Id.* As already explained, the ALJ's opinion was highly detailed, enumerating evidence that could support a disability finding and evidence that would not support such a finding. He cited the Claimant's self-reports, doctors' treatment notes, and a broad swath of the record. At bottom, there was substantial evidence in the record to support the ALJ's discounting of Webb's opinion, including Claimant's marked improvement after May of 2021, her ongoing care for her children and their home, her self-reports of feeling well, and more.

## RECOMMENDATION

Based upon the record, memoranda, and proceedings herein, and for the reasons stated above, the Court RECOMMENDS THAT:

1. Plaintiff's Motion for Summary Judgment, (Dkt. No. 16), be **DENIED.**

2. Defendant's Motion for Summary Judgment, (Dkt. No. 21), be **GRANTED**.


Dated: May 31, 2023                              s/David T. Schultz
                                                 DAVID T. SCHULTZ
                                                 U.S. Magistrate Judge




## NOTICE

**Filings Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).